RENDERED: JANUARY 2, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1501-MR

JAMES RANDALL NANTZ                                  APPELLANT

v.           APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 19-CR-00065

COMMONWEALTH OF KENTUCKY                      APPELLEE

AND

NO. 2024-CA-1502-MR

JAMES RANDALL NANTZ                                    APPELLANT

v.           APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 20-CR-00017

COMMONWEALTH OF KENTUCKY                      APPELLEE

AND

NO. 2024-CA-1503-MR

JAMES RANDALL NANTZ                                    APPELLANT

v.

APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 20-CR-00170

COMMONWEALTH OF KENTUCKY                    APPELLEE

AND

NO. 2024-CA-1504-MR

JAMES RANDALL NANTZ                    APPELLANT

APPEAL FROM HARLAN CIRCUIT COURT
v.          HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 20-CR-00178

COMMONWEALTH OF KENTUCKY                    APPELLEE

AND

NO. 2024-CA-1505-MR

JAMES RANDALL NANTZ                    APPELLANT

APPEAL FROM HARLAN CIRCUIT COURT
v.          HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 21-CR-00020

COMMONWEALTH OF KENTUCKY                    APPELLEE

AND

NO. 2024-CA-1506-MR

JAMES RANDALL NANTZ                                              APPELLANT

v.                       APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 21-CR-00021

COMMONWEALTH OF KENTUCKY                         APPELLEE

AND

NO. 2024-CA-1507-MR

JAMES RANDALL NANTZ                                                APPELLANT

v.                       APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 21-CR-00081

COMMONWEALTH OF KENTUCKY                         APPELLEE

AND

NO. 2024-CA-1508-MR

JAMES RANDALL NANTZ                                                APPELLANT

APPEAL FROM HARLAN CIRCUIT COURT
HONORABLE KENT HENDRICKSON, JUDGE
ACTION NO. 21-CR-00102

v.

COMMONWEALTH OF KENTUCKY                                    APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ECKERLE, McNEILL, AND MOYNAHAN, JUDGES.

ECKERLE, JUDGE:  Appellant, James Randall Nantz ("Nantz"), seeks review of

the Harlan Circuit Court's Orders Revoking Probation (collectively, the "Orders").

After careful review, we affirm, as the Trial Court made the mandatory statutory

findings, and the record on appeal supports the rulings.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal arises from Nantz's multi-year crime spree, eight criminal

cases, and dozens of charges.  On September 21, 2023, Nantz entered into a plea

agreement in which he admitted guilt to a total of 25 criminal charges in exchange

for a cumulative sentence of 12 years; however, the agreement did not call for

incarceration; rather, Nantz would be probated for five years.[1]  On November 15,

---

[1] The eight case numbers and corresponding charges Nantz pled guilty to committing are as
follows: 19-CR-00065, two counts of first-degree wanton endangerment and one count of being
a persistent felony offender in the second degree; 20-CR-00017, one count each of first-degree

-4-

2023, in accordance with the plea agreement, the Trial Court sentenced Nantz to 12 years, probated for five years under the supervision of Probation and Parole.[2] Despite the large number and severity of his crimes, as well as his admitted guilt, Nantz was not immediately sent to prison. As an additional condition of Nantz's probation, the Trial Court ordered him to complete a long-term, inpatient rehabilitation program for a minimum of one year. Accordingly, on January 19, 2024, Nantz departed the Harlan County Detention Center and entered the Addiction Recovery Care Program ("treatment program") in Louisa, Kentucky. Nantz was not able or willing to comply with the terms of his probation, including his participation in the treatment program, for long. On June 7, 2024, Nantz unilaterally quit the program against staff advice and without reporting or contacting Probation and Parole.

---

fleeing or evading, first-degree wanton endangerment, and reckless driving; 20-CR-00170, one count of receiving stolen property under $10,000; 20-CR-00178, two counts of second-degree fleeing or evading police; 21-CR-00020, one count each of first-degree possession of a controlled substance, leaving the scene of an accident, first-degree criminal mischief, and first-degree fleeing or evading; 21-CR-00021, one count of theft by unlawful taking (auto) over $500 but under $10,000; 21-CR-00081, two counts of receiving stolen property under $10,000; 21-CR-00102, one count each of second-degree fleeing or evading, receiving stolen property under $10,000, obscuring identity of machine or other property over $500 but under $10,000, operating a motor vehicle under the influence of alcohol, failure of owner to maintain required insurance, and failure to produce insurance card, careless driving, and first-degree fleeing or evading. The Trial Court's eight Final Judgments on Guilty Plea all stated that the sentences on each charge shall run concurrently for a total of 12 years' imprisonment, probated for five years.

[2] A "'supervised individual' means an individual placed on probation . . . by a court or serving a period of parole or post-release supervision from prison or jail." Kentucky Revised Statutes ("KRS") 439.250(12).

Days later, on June 12, 2024, Probation and Parole Officer Jonathan Creech ("Creech") filed a Violation of Supervision Report ("Report") documenting two violations. Record on Appeal ("ROA"),[3] pp. 275-76. First, Nantz failed to complete inpatient substance-abuse treatment. Second, Nantz absconded from supervision by failing to contact Probation and Parole. The Trial Court subsequently issued a bench warrant for Nantz's arrest.

Two months later, in August of 2024, an off-duty Probation and Parole officer allegedly recognized Nantz at a private event. The officer, who was familiar with Nantz and was aware that he had absconded from supervision, contacted the Kentucky State Police ("KSP"). Upon KSP's arrival at the scene, officers attempted to make contact with Nantz, who was driving a four-wheel, all-terrain vehicle. According to Creech's testimony at a subsequent hearing, Nantz evaded KSP officers by jumping off the vehicle and running into a nearby wooded area. The incident did not result in any charges against Nantz.

At some point during his time on the lam, Nantz travelled to Virginia where he resided with his mother, son, and girlfriend until his arrest on September

---

[3] The record on appeal comprises eight criminal cases, consisting of numerous volumes. As the relevant documents are substantively duplicative for purposes of this consolidated appeal, and in consideration that the Trial Court held a single revocation hearing for all eight cases, the Court cites to the paginated record in the lead criminal case, *Commonwealth v. Nantz*, 19-CR-00065, Court of Appeals Case No. 2024-CA-1501-MR.

26, 2024. Nantz was then extradited to Kentucky. On October 15, 2024, the Commonwealth filed a motion to revoke Nantz's probation.

The Trial Court conducted the probation revocation hearing on November 6, 2024. This evidentiary hearing consisted of the Report and the testimony of both Creech and Nantz. At the beginning of the hearing, Nantz's counsel informed the Trial Court that the Commonwealth had no objection to allowing Nantz to return to the treatment program. ROA Video Recording ("VR"), 11/6/2024, 10:53:05-14. The Commonwealth confirmed its agreement, stating that "[Nantz] was doing well in rehab . . . and his mother is very ill . . . and [Nantz] left, but . . . we encourage him to finish out his rehab without problems." *Id.* at 10:53:17-41. The Commonwealth offered continued leniency, noting Nantz's cooperation in obtaining convictions for others charged with crimes and its willingness "to give [Nantz] a second chance, particularly in light of his favorable testimony in the Polly case . . . ."[4] *Id.* at 10:53:49-56. At that point, the Trial Court requested that both counsel approach the bench. A bench conference ensued during which the Trial Court requested and received confirmation that there was no "quid pro quo" for Nantz's testimony in the Polly case. *Id.* at 10:54:8-25. When

---

[4] The Polly case involved two brothers who were jointly tried and convicted of murder by complicity. During the trial, Nantz averred that one of the brothers detailed the crimes while the two shared a jail cell over an eight-month period. *Commonwealth v. Fess Polly*, 21-CR-00034 (Harlan Circuit Court) and *Commonwealth v. Derrick Polly*, 21-CR-00033 (Harlan Circuit Court).

the Trial Court went back on the record, it stated, "[L]et's have a hearing . . . . I want to hear from Probation and Parole." *Id.* at 10:54:25-29.

The evidentiary portion of the hearing commenced with Creech's testimony. Creech recounted the details of the Report, including Nantz's unauthorized departure from the treatment program on June 7, 2024, and his failure to contact Probation and Parole. Creech testified that prior to June 7, 2024, Nantz had not incurred any known violations at the treatment program. Creech then relayed the alleged incident involving Nantz fleeing from law enforcement through the woods. Creech admitted that he did not submit a second violation report memorializing this incident, and law enforcement did not charge Nantz with any additional crimes, including fleeing or evading.

Nantz's counsel questioned Creech about Probation and Parole's ability to monitor Nantz if the Trial Court ordered him to complete the treatment program. Creech confirmed that Probation and Parole could supervise Nantz should he return to the treatment program. In addition, the Trial Court questioned Creech about the circumstances of Nantz's arrest in Virginia. According to Creech, Nantz did not incur any new charges in Virginia and was therefore likely arrested on the Court's outstanding bench warrant.

Nantz also testified at the hearing, stating a positive impact from the brief treatment program upon his life, including some alleged progress in his

-8-

recovery journey before relapsing. Even though he quit voluntarily and against advice, Nantz referred to the treatment program as "life changing." VR, 11/6/2024, 11:02:01-02. Nantz further elucidated on his personal struggles. To begin, Nantz testified that when he entered the treatment program, his mother's residence had just burned down in a fire. Nantz testified that the event was distressing because his elderly mother cared for his nine-year-old son while he attended the treatment program. Nantz stated that he persevered until early June when he was informed that his mother was admitted into the Intensive Care Unit ("ICU") at the Harlan Hospital. With approval from Probation and Parole, treatment program personnel authorized and facilitated Nantz's visitation with his mother in the ICU that very week. Nantz claimed that his mother's prognosis was "life threatening." *Id.* at 11:03:17-18. Given his grandmother's physical deterioration and his father's absence, Nantz's son became distraught when the visitation at the ICU ended, resulting in the boy physically clinging to his father. Nantz emotionally recounted the angst he experienced when he left his son.

Nantz testified that he regretted his decision to leave the recovery program a few days later, against staff advice and without permission from Probation and Parole, but professed concern for his mother and son. He further explained that he fled to Virginia because his girlfriend resided within the state, and she was caring for his son while his mother remained hospitalized. His mother

recovered, and when the hospital discharged her, Nantz transported her from Kentucky to his girlfriend's residence in Virginia where the family continued residing. Upon his own counsel's questioning, Nantz admitted that during this time period he relapsed twice by using Suboxone, a controlled medication that he had not been prescribed. Nantz concluded his testimony by requesting that the Trial Court permit him to return to the treatment program, that further rehabilitation would be beneficial, and that this time he would comply with the terms of his probation.

Following the Commonwealth's statement that it did not have any questions for Nantz, the Trial Court proceeded with questioning. The Trial Court asked Nantz for the reason that he chose Virginia for his place of abscondment. Nantz again explained that his girlfriend resided in Virginia and permitted him, his mother, and his son to live at the residence. Nantz also revealed that law enforcement arrested him in Virginia for failure to pay fines on a prior case.

The Trial Court additionally questioned the Commonwealth regarding Nantz's testimony in the Polly case. The Trial Court stated, "I want to establish something for the record . . . there was no quid pro quo . . . ." VR, 11/6/2024, 11:06:28-47. At that point, the Commonwealth interrupted the Trial Court, responding "absolutely not." *Id.* at 11:06:47-48. The Commonwealth informed the Trial Court that Nantz's assistance with the Polly case was his attempt to do

-10-

"what's right." *Id.* at 11:07:20. The Commonwealth went so far as to state the following: "[Nantz] has an addiction problem. His mother is trying to raise his nine-year-old child . . . . He pled guilty to all these crimes, which were all drug related . . . he needs rehab. He's sick. He needs rehab. He needs all the encouragement to get his life back on track." *Id.* at 11:07:47.

At the close of the hearing, the Trial Court refrained from issuing its decision, instead opting to take the matter under advisement. Less than two weeks later, on November 18, 2024, the Trial Court issued the Orders revoking Nantz's probation in all eight cases. The Orders are substantively identical notwithstanding the narration of Nantz's case-specific charges and sentences. In the Orders, the Trial Court recounted Creech's testimony and Report, including the August 2024 KSP incident. Based on these grounds, the Trial Court found that Nantz violated his probation by leaving the treatment program early without permission and by absconding from Probation and Parole's supervision. The Orders included the statutory findings required pursuant to KRS 439.3106(1)(a). More specifically, the Trial Court found that Nantz's "failure to comply with the conditions of supervision constitute a significant risk to prior victims of [Nantz] or the community at large, and that [he] cannot be appropriately managed in the community." ROA, p. 298. Consequently, the Trial Court ordered Nantz to begin serving his 12-year prison sentence.

Nantz filed separate appeals from the Orders, which this Court consolidated pursuant to Kentucky Rule of Appellate Procedure 2(F)(2).

## STANDARD OF REVIEW

In reviewing the Orders revoking Nantz's probation, this Court utilizes an abuse of discretion standard of review. *Commonwealth v. Andrews*, 448 S.W.3d 773, 780 (Ky. 2014) (citing *Commonwealth v Lopez*, 292 S.W.3d 878 (Ky. 2009)). An abuse of discretion occurs where "the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999). As applied in the context of probation revocation, "we will not hold a trial court to have abused its discretion unless its decision cannot be located within the range of permissible decisions allowed by a correct application of the facts to the law." *McClure v. Commonwealth*, 457 S.W.3d 728, 730 (Ky. App. 2015) (citing *Miller v. Eldridge*, 146 S.W.3d 909, 915 n.11 (Ky. 2004)).

## ANALYSIS

KRS 439.3106, titled "Sanctions to which supervised individuals are subject[,]" enumerates the criteria Trial Courts must consider when evaluating the aptness of probation revocation. In pertinent part, KRS 439.3106 provides as follows:

(1) Supervised individuals shall be subject to:

(a) Violation revocation proceedings and possible incarceration for failure to comply with the conditions of supervision when such failure constitutes a significant risk to prior victims of the supervised individual or the community at large, **and** cannot be appropriately managed in the community; **or**

(b) Sanctions other than revocation and incarceration as appropriate to the severity of the violation behavior, the risk of future criminal behavior by the offender, and the need for, and availability of, interventions which may assist the offender to remain compliant and crime-free in the community.

KRS 439.3106(1)(a)-(b) (emphasis added).

The General Assembly's use of the conjunction "and" in subsection (1)(a) denotes the proscription against revocation of an individual's supervised probation and the imposition of incarceration absent the establishment of two grounds; to wit, (1) the supervised individual's incompliant behavior demonstrates that the individual is a significant risk to prior victims or the community, and (2) the individual cannot be managed within the community. *See, e.g.*, *Andrews*, 448 S.W.3d at 780 ("We conclude that KRS 439.3106(1) requires trial courts to consider whether a probationer's failure to abide by a condition of supervision constitutes a significant risk to prior victims or the community at large, and whether the probationer cannot be managed in the community before probation may be revoked.").

Correspondingly, the conjunction "or" preceding subsection (1)(b) conveys the Trial Judge's discretion to impose sanctions other than incarceration, depending on the violation and circumstances. *See, e.g.*, *McClure*, 457 S.W.3d at 732 ("[T]he General Assembly intended the task of considering and making findings regarding the two factors of KRS 439.3106(1) to serve as the analytical precursor to a trial court's ultimate decision[] whether revocation or a lesser sanction is appropriate."). Thus, once a Trial Court determines that a supervised individual violated the terms of his probation, "there are two possible outcomes: revocation and possible incarceration, KRS 439.3106(1), **or** the imposition of sanctions 'other than revocation,' KRS 439.3106(2)." *Andrews*, 448 S.W.3d at 777 (emphasis added).

Here, Nantz does not contest that he violated the terms of his probation by absconding from supervision and failing to complete the treatment program. These two conditions were the mainstay of his probation and avoidance of prison at the outset of his plea agreement. Nantz also recognizes that the Orders on appeal contain the two statutorily required findings. Nantz, however, argues that the Trial Court committed several errors by revoking him. First, Nantz argues that the Trial Court failed to provide a reviewable analysis supporting its findings pursuant to KRS 439.3106(1). Second, Nantz contends that the Trial Court's inability to articulate its reasoning is due to insufficient evidence supporting said

findings. Finally, Nantz alleges reversible error in the Trial Court's refusal to impose lesser sanctions other than revocation and incarceration. We address each argument in turn.

### I. Sufficiency of the Trial Court's Analysis

Nantz's first allegation of error concerns the adequacy of the Trial Court's analysis supporting its findings under KRS 439.3106(1)(a). Nantz maintains that a Trial Court must provide a reviewable analysis of the requisite statutory findings instead of general conclusory reasons. Nantz cites *Commonwealth v. Alleman*, 306 S.W.3d 484, 487 (Ky. 2010), for this proposition. However, *Alleman* not only preceded the General Assembly's passage of KRS 439.3106, but also supports affirmance of the Orders *sub judice*. In *Alleman*, our Supreme Court considered whether the Trial Court's oral ruling revoking probation passed constitutional muster. At the time, the criteria enumerated in KRS 439.3106 was not at play. Regardless, the Kentucky Supreme Court held that "a recorded oral recitation by the trial court of findings and reasons for revocation, if otherwise sufficient, satisfies applicable due process requirements." 306 S.W.3d at 486. The Supreme Court determined that the Trial Court's reasons for revocation, which were purely based on the probated individual's failure to report upon release from custody, were sufficient to support the Trial Court's oral findings. *Id.* at 485. Therefore, we reject Nantz's argument that *Alleman* mandates reversal.

Furthermore, since the General Assembly's enactment of KRS 439.3106 in 2011, the Kentucky Supreme Court has expressly dispensed with the notion that a Trial Court must convey its reasoning in support of the statutorily required findings under subsection (1)(a). *Andrews*, 448 S.W.3d at 777. Indeed, the Supreme Court explained that the statutorily mandated findings must be stated in the revocation order, but the grounds supporting those findings may only lead to reversal if those findings lack evidentiary support. *Id.* at 779.

Notwithstanding *Andrews*, *supra*, Nantz argues that this Court, in *Helms v. Commonwealth*, 475 S.W.3d 637, 645 (Ky. App. 2015), held that perfunctory recitation of the required statutory findings is insufficient. We do not accept Nantz's representation of *Helms*, which involved a unique factual pattern concerning revocation of an offender's pretrial diversion based on the diversion agreement's zero-tolerance provision. *Id.* at 639. In *Helms*, the Trial Court's revocation order stated that the offender was given one last opportunity to change his behavior pursuant to the diversion agreement. *Id.* at 640. The subject order also included the requisite findings pursuant to KRS 439.3106(1)(a). *Id.* at 640-41. On appeal, this Court held that despite the Trial Court's perfunctory recital of the statutory criteria, it clearly relied solely on the zero-tolerance provision. *Id.* at 644. Thus, the Court's analysis continued with an evaluation of the evidence supporting the Trial Court's findings. *Id.* at 645. Ultimately, we held that a Trial Court's

-16-

revocation of diversion from a first-time offender due to a single positive drug test was insufficient to satisfy KRS 439.3106(1)(a). *Id.*

This Court has since clarified our holding in *Helms. See, e.g.*, *New v. Commonwealth*, 598 S.W.3d 88, 90 (Ky. App. 2019) (stating that "[a] trial court is not required to provide explanations for those [KRS 439.3106(1)(a)] findings; instead, it must only make the findings, which must be supported by the evidence of record") (citing *McClure*, 457 S.W.3d at 733). To dispose of *Helms'* burgeoning and "misconstrued" holding, this Court "emphatically reiterate[d] that *Helms* does not mean that a court must provide detailed explanations for the findings required by KRS 439.3106." *Kendrick v. Commonwealth*, 664 S.W.3d 731, 735 (Ky. App. 2023). Based on this precedential authority, we may affirm a Trial Court's revocation order so long as the Trial Court makes the mandatory statutory findings, even in a cursory manner, and those findings are supported by a preponderance of record evidence on appeal.

In the case before us, the Trial Court's reasoning was not fleeting; rather, it provided an analysis of the evidence supporting revocation. Most importantly, and as it relates to Nantz's specific argument, the Trial Court explicitly found that the evidence demonstrated that Nantz's failure to abide by the conditions of supervision constituted a significant risk to prior victims or the community at large, and he cannot be managed in the community. Even assuming,

*arguendo*, that the Trial Court's findings were simply parroting the language of the statute, those words satisfy the requirement under the law of this Commonwealth so long as the evidence supports those findings. The Trial Court is under no obligation to elaborate as to the reasoning behind its conclusion that Nantz's actions made him a significant risk to the community at large and cannot be appropriately managed in the community. *McClure*, 457 S.W.3d at 734 (holding that once the two statutory findings are made, "no further explanation" is required). Trial Courts are busy places; short, clear orders are a necessary part of efficient docket management. Unlike Courts of Appeal, Trial Judges do not have the luxury of time to draft lengthy dissertations supporting all of their decisions.

Under the facts of this case, Nantz was not clearly entitled to probation at the outset, given the severity and numerosity of his crimes. But the Trial Judge and the prosecutor showed him mercy and gave him yet another chance in his life to be a productive citizen. Nantz returned that gift in very short order. He abandoned treatment, absconded probation, fled from law enforcement to another state, and admittedly continued using narcotics and breaking the law. Nantz recounted the hardships in his life, but he did not maintain that he was law-abiding, nor could he, given the uncontradicted evidence to the contrary. Nantz provided no proof of employment. In fact, we still do not know what he was doing during his period of desertion, other than committing more crimes. Nantz never

-18-

made a meaningful attempt to comply with probation. Instead, it could easily be said that he made a mockery of it. These substantial reasons for refusing to return Nantz to what would likely be another futile, short period of non-compliance, if not lawlessness, on probation are all plainly evident and do not need further elucidation in the form of a complex, lengthy order from a Trial Judge.

II.     *Sufficiency of the Evidence*

Having determined the Trial Court provided the mandatory findings in the Orders, we turn to the sufficiency of the evidence supporting those findings. Nantz suggests that there is no evidence to support the Trial Court's conclusions that he is a significant risk to prior victims or the community at large, or that he cannot be managed in the community.

As detailed above, Nantz admitted to the following during the evidentiary hearing: (1) he departed the Court-mandated treatment program early without permission; (2) he failed to contact Probation and Parole at any time following his departure from the treatment program; (3) he left the jurisdiction without permission; and (4) he used unlawful narcotics more than once. Those facts alone provided the Trial Court with sufficient evidence to support revocation and incarceration under KRS 439.3106(1)(a). If one is not inclined to be supervised, there is no point in continuing to offer it. Yet, in addition to Nantz's admissions, the Trial Court also received testimony that Nantz evaded KSP after

-19-

departing the treatment program. In conjunction with this evidentiary hearing testimony, the Trial Court took the matter under advisement to review Nantz's lengthy criminal history in detail.

We pointedly note that Nantz's criminal history lends credence to Creech's account of the August 2024 incident, thereby highlighting the Trial Court's discretion when considering the statutory criteria. Specifically, Nantz incurred multiple convictions for fleeing and evading law enforcement. In fact, the record before this Court includes an arrest warrant with a similar factual narrative to Creech's description of the August 2024 incident. Specifically, in July of 2020, "KSP ordered [Nantz] to stop and [Nantz] ran on foot into the creek to avoid being arrested." ROA, p. 117. Another factual similarity is found within the police report filed in case number 19-CR-00065, wherein the officer stated that Nantz was riding a similar all-terrain vehicle with his co-defendants when a shooting ensued.

Nantz would like to parse his lengthy criminal record and separate his years-long series of intentional lawlessness into single units of purported misfortune and mistakes in an attempt to discount their persistence and seriousness. In reality, his pattern of criminality and his continued refusal to account for it and abide by the law is quite concerning. Despite his statements to the contrary, Nantz has been provided with numerous opportunities to comply with even minimal requirements and simple probationary terms. The very reason for

probating Nantz instead of sending him to prison in the first place for his crime spree was that he would benefit from treatment. He then refused to comply with said treatment, declined to cooperate, failed to report, and continued using drugs and committing crimes. Courts of law must neither ignore nor countenance such illicit behavior. When someone has amply demonstrated his abject failure to comply with supervised probation, Courts are under no obligation to return that person to the community.

Indeed, certain violations of probation, such as Nantz's, including absconding from supervision, fleeing the Commonwealth, and continued narcotics use, sufficiently evidence the required statutory criteria. For instance, in *Andrews*, *supra*, our Supreme Court upheld revocation where the violation consisted of a single failed drug test that the probated individual deceitfully blamed on diet pills. 448 S.W.3d at 780. The Trial Court considered the probated individual's violation, criminal history, and refusal to acknowledge his need for rehabilitation. *Id.* Likewise, in *McClure*, this Court upheld revocation where the probated individual used prohibited substances and attempted to alter the results of a drug screen. 457 S.W.3d at 733. This Court held that "a person who would go to such lengths to continue using a substance he was forbidden to use under penalty of five years in prison posed a significant risk to, and was unmanageable within, the community in which he lived." *Id.*

-21-

We also mention *Compise v. Commonwealth*, 597 S.W.3d 175, 178 (Ky. App. 2020), a case in which the offender violated the terms of her supervision by refusing to provide her DNA and urine samples, ignored the Trial Court's order to pay restitution, and failed to report to Probation and Parole on two occasions. *Id.* at 182. This Court upheld the revocation, holding that "a defendant who will not cooperate with the conditions of her supervision may indeed constitute a significant risk to the community at large and be unmanageable in the community." *Id.* Therefore, in accordance with applicable precedent, Nantz's continuing pattern of illegal drug use, failure to complete mandatory, inpatient substance-abuse treatment, absconding from supervision, and evading law enforcement, all support the Trial Court's findings that he poses a risk to the community at large and cannot be managed within the community. *See, e.g.*, *New*, 598 S.W.3d at 90-91 (holding that an offender's continued usage of drugs and submission of false paperwork to a drug court satisfied the statutory factors); *cf. Helms*, 475 S.W.3d at 645 (finding an abuse of discretion where there was no evidence the offender would *not* benefit from drug treatment or that he would *not* cooperate in such treatment).

We recognize that Nantz entered the treatment program, as required and as he agreed to do, and apparently abided probation for several months. Completing his treatment program would have been commendable, and even some progress is appreciated. This Court acknowledges that Nantz has undergone

stressful life circumstances, and his lifestyle contributed to his lapses in judgement. His circumstances were less than ideal, but so were his own choices. His struggle with substance abuse is considerable, ongoing, and potentially will endure for the rest of his life. We surmise that the Commonwealth offered probation at the outset, and the Trial Court accepted it, because Nantz needed help, and he was not taking care of himself on his own. And again, the prosecution continued to be willing to permit Nantz to continue probation and return to the treatment program despite his significant failures and repeated crimes because of Nantz's hardships and attempts. Nonetheless, it is the Trial Court which is vested with discretion in this matter – not Nantz himself or the prosecution. And we cannot overturn that Court's decisions at will, absent the Trial Court's abuse of such discretion. The Trial Court is in the best position to observe the witnesses and weigh the evidence. *McClure*, 457 S.W.3d at 734 (reasoning that this Court's "proper role is merely to evaluate the sufficiency of the evidence . . . . [T]o do[] otherwise would be to invade the province of fact finding best occupied by our trial courts").

In sum, the Orders recited the necessary statutory language that Nantz posed a significant risk and is unable to be managed in the community. A review of the evidence supports the Trial Court findings based on authoritative precedent involving analogous facts. Therefore, the Trial Court's revocation of Nantz's probation was not arbitrary, unreasonable, or against sound legal principles. In

-23-

echoing our Supreme Court's conclusion in *Andrews*, "although [Nantz's] situation was not clear-cut and another judge may have opted for a lesser sanction, the trial court's decision to revoke [Nantz's] probation was neither arbitrary nor unreasonable." 448 S.W.3d at 781.

Before moving on to Nantz's final argument, it is incumbent upon this Court to comment on Nantz's allegations that the Trial Court's decision to revoke his probation was based on the Commonwealth's comment that Nantz provided favorable testimony in the Polly case. Nantz's argument is based purely on conjecture. Nantz surmises and then opines without evidence that because the Commonwealth agreed to permit him to return to the treatment program, the only logical conclusion is the Trial Court revoked Nantz's probation due to his favorable testimony in the Polly case.

First, Nantz has not shown any reason for the Trial Court – a Court of law – to frown upon Nantz's desire to provide evidence in a different criminal case involving murder. Indeed, Nantz is complaining, somewhat ironically, that the Trial Court is taking his own misconduct too seriously. Second, on its face, the Trial Court's inquiry seems quite reasonable. The prosecution was offering yet more leniency without sanction for Nantz's continued criminality and failure to comply meaningfully with his probation in any significant manner. Other, similarly-situated defendants might not receive such repeated mercy, and the Trial

Judge was right to have questions about it. And questions were all that occurred here – no pronouncements or rulings. Third, the Commonwealth expressly denied giving Nantz a free pass solely by virtue of that testimony in the other case. The record on appeal demonstrates that the Trial Court conducted a brief bench conference upon learning of Nantz's testimony in the Polly case. When the Trial Court resumed the evidentiary hearing on the record, the Commonwealth confirmed that there was no quid pro quo for Nantz's testimony and continued with hearing Creech's testimony. Other than this brief exchange, we can find no support for Nantz's supposition that the Trial Court revoked his probation based solely on his testimony in the Polly case. On the contrary, the Orders describe the facts surrounding Nantz's probation violations and make no mention of the Polly case. It is very significant and much more important, as detailed throughout this Opinion, that there are ample grounds supporting the Trial Court's revocation of Nantz's probation because of Nantz's continued refusal to comply with the law, supervision, reporting, or drug treatment.

### III. Imposition of Lesser Sanctions

Finally, we address Nantz's argument that the Trial Court should have imposed lesser sanctions pursuant to KRS 439.3106(1)(b). We are certainly mindful of the Commonwealth's statements that Nantz is in need of substance abuse treatment. Yet, Nantz does not provide this Court with any precedential

authority mandating a Trial Court to impose lesser sanctions upon a finding that revocation is statutorily permissible. Nantz's inability to provide such authority is significant as we are bound by an abuse of discretion standard of review.

Again, we cite our decision in *McClure*, *supra*: "[T]he General Assembly intended the task of considering and making findings regarding the two factors of KRS 439.3106(1) to serve as the analytical precursor to a trial court's ultimate decision: whether revocation or a lesser sanction is appropriate." 457 S.W.3d at 732 (citing *Andrews*, 448 S.W.3d 773). Said differently, this Court must assume that the Trial Court considered lesser sanctions when considering the existence of the two statutory factors promulgated in subsection (1)(a). Undeniably, "[n]othing in [KRS 439.3106] or in the Supreme Court's interpretation of it *requires* the trial court to impose lesser sanctions prior to revoking probation." 457 S.W.3d at 732 (emphasis in original). *McClure*, being binding precedent, permitted the Trial Court to revoke Nantz's probation and impose imprisonment for the agreed upon term pursuant to KRS 439.3106(1)(a). *See also Hall v. Commonwealth*, 566 S.W.3d 578, 581 (Ky. App. 2018) (finding that KRS 439.3106 does not require a Trial Court to "consider revocation only as a last resort").

Finally, we must note that while Nantz minimizes his crimes, we do not. His criminal record, the numerous and serious charges that are the subject of

-26-

the instant case, his non-compliance with the law and the terms of his supervision while on probation, and his wrongdoing are significant and have permeated long-stretches of his life. He pleaded guilty to 25 crimes in the eight cases in this appeal alone, many of which involved clear danger to himself and others, including wanton endangerment, fleeing and evading, narcotics use, driving under the influence of an intoxicant, leaving the scene of an accident, and being a persistent felony offender. His repeated charges for receiving stolen property and car theft evince predatory behavior towards the community. Nantz is not merely hurting himself and frustrating and antagonizing law enforcement; he is endangering everyone around him. The Trial Court in no way abused its discretion in finding Nantz to be a significant risk who cannot be managed in the community any longer. Nantz was afforded many chances; he abused and forfeited them. Nantz has proven himself to be unable or unwilling to comply with the law and his probation. He is responsible for his current incarceration, and revocation was neither unreasonable nor arbitrary.

## CONCLUSION

The Trial Court made the requisite findings pursuant to KRS 439.3106, and those findings are supported by the record evidence on appeal. For these reasons, we affirm the Harlan Circuit Court's Orders Revoking Probation.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Shannon Dupree | Russell Coleman |
| Assistant Public Advocate | Attorney General of Kentucky |
| Frankfort, Kentucky | |
| | Jacob M. Abrahamson |
| | Assistant Solicitor General |
| | Frankfort, Kentucky |